**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MATEO DUNNE,
8701 Camden Street,
Mount Vernon, Virginia 22308,

       **Plaintiff,**

v.

WARD BREHM AND/OR PETER
WILLIAM MAROCCO AND/OR
CAROL MOSELEY BRAUN, in his or
her official capacity as President/Chief
Executive Officer and/or Board Chair
and Head of the
UNITED STATES AFRICAN
DEVELOPMENT FOUNDATION,
1400 I Street NW, Suite 1000,
Washington, DC 20005,

       **Defendant.**

---

**COMPLAINT**

Plaintiff Mateo Dunne, by and through undersigned counsel, brings this action against

Defendant United States African Development Foundation for violations of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 2000e-3, and 2000e-16. As grounds therefore,

Plaintiff alleges as follows:

**JURISDICTION AND VENUE**

- 1 -

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 42 U.S.C. § 2000e-5(f)(3) (Title VII of the Civil Rights Act of 1964), 42 U.S.C. § 2000e-16 (Federal employee provisions of Title VII), and 28 U.S.C. § 1346(b).

2. Venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b) and (e). Defendant United States African Development Foundation maintains its headquarters at 1400 I Street NW, Suite 1000, Washington, DC 20005, and all or substantially all of the unlawful employment practices alleged herein were committed within the District of Columbia.

3. Plaintiff has exhausted all administrative remedies as required by law. Plaintiff initiated Equal Employment Opportunity ("EEO") counseling on February 2, 2022; filed a formal EEO complaint on April 1, 2022; requested a hearing before an Equal Employment Opportunity Commission ("EEOC") Administrative Judge on January 27, 2023; and received a Final Agency Action on August 30, 2024. Plaintiff filed a timely Notice of Appeal with the EEOC Office of Federal Operations on September 28, 2024. On December 18, 2025, the EEOC issued a decision affirming the Agency's Final Order. On January 20, 2026, Plaintiff filed a timely request for reconsideration with the EEOC, but no ruling on that request has been made. This Complaint is filed within ninety (90) days of the EEOC's final decision on an appeal and/or following the exhaustion of administrative remedies as required under 29 C.F.R. § 1614.407.

**PARTIES**

4. Plaintiff Mateo Dunne (formerly Matthew Stanton Dunne III) is a White male who, at all relevant times, was a Federal employee serving as General Counsel of the United States

- 2 -

African Development Foundation. Plaintiff currently resides at 8701 Camden Street, Mount Vernon, Virginia 22308.

5. Defendant United States African Development Foundation ("USADF" or "Agency") is a Government corporation established pursuant to 22 U.S.C. § 290h et seq. The Agency is governed by a Board of Directors and managed by a President and Chief Executive Officer ("P/CEO"). The Agency has an annual budget of approximately $45 million and employs approximately 30-40 Federal employees and contractors at its headquarters in Washington, DC. The Agency is an "employer" and "agency" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and is subject to the Federal sector provisions of Title VII, 42 U.S.C. § 2000e-16.

## FACTUAL ALLEGATIONS

### A.  Agency Leadership

6. Plaintiff is a Caucasian (white) male. At all relevant times, Agency leadership—including but not limited to P/CEO Travis Adkins ("Adkins"), Chief Program Officer Elisabeth Feleke ("Feleke"), Chief of Staff Brandi James ("James"), and Chief Financial Officer Mathieu Zahui ("Zahui")—were aware of Plaintiff's race and color.

7. Adkins was hired as a Federal employee and served as P/CEO from January 18, 2022 to February 10, 2025. Adkins is a Black male.

8. Feleke was hired as a Federal employee and has served as Chief Program Officer since November 2020. She served as Acting President and CEO from May 17, 2021 through January 17, 2022 and was Plaintiff's first-line supervisor during that period. Feleke is a Black female.

9. James was hired as a Federal employee and served as Chief of Staff and Director of External Affairs while Plaintiff was employed by ADF. James is a Black female.

10. Zahui served as Chief Financial Officer and and Managing Director of Finance and Administration from January 2018 to February 2026. Zahui was responsible for financial operations, information technology services, human resource services, travel, and procurement. Zahui is a Black male. On February 23, 2026, Zahui pled guilty in Federal court to accepting gratuities from a government contractor and making false statements to federal law enforcement officers.

### B. Plaintiff's Academic and Professional History

11. Plaintiff completed an ambitious four-year, joint-degree program at Emory University.

12. Plaintiff graduated from Emory University with a B.A. *summa cum laude* in History and French and a M.A. in History in 1998. Plaintiff completed the research for his M.A. thesis at the French military archives in Paris during his junior year.

13. Plaintiff completed an ambitious four-year, joint-degree program at Georgetown University.

14. Plaintiff graduated with Distinction from the Georgetown University School of Foreign Service with a M.S. in Foreign Service. Plaintiff completed the International Business Honors Program at the Georgetown University School of Foreign Service. During his graduate studies, Plaintiff served as a senior editor with the Georgetown Journal of International Affairs.

15. Plaintiff graduated from the Georgetown University Law Center with a J.D. and a Certificate in World Trade Organization Studies. During law school, Plaintiff received CALI Excellence

for the Future Awards in International Law, International Trade Law, International Business Transactions/Project Finance, and Latin American Legal Institutions.

16. During law school, Plaintiff served as a Fellow with the Institute for International Economic Law and as a senior editor with the Georgetown Journal of International Law (formerly Law and Policy in International Business). Plaintiff completed legal internships with the U.S. Agency for International Development's Office of General Counsel, the U.S. Senate Commerce Committee's Consumer Affairs and Telecommunications Subcommittees, and the Feinberg Group. Plaintiff also completed an internship with the Office of the United States Trade Representative's Office of Intellectual Property, where he supported the preparation of the annual Special 301 report on foreign intellectual property rights regimes.

17. From August 2002 to November 2002, Plaintiff held a legal internship with the Office of the U.S. Trade Representative in Geneva, Switzerland, where he supported attorneys engaged in international trade litigation before the World Trade Organization.

18. From December 2002 to September 2003, Plaintiff served as a law clerk on the United States Court of Appeals for the Fifth Circuit in New Orleans, Louisiana.

19. From October 2003 to December 2003, Plaintiff was only the second American to serve as a law clerk (stagiaire) to the World Trade Organization's Appellate Body, which is considered the supreme court of international trade law.

20. From January 2004 to March 2007, Plaintiff served as a senior associate for the law firm of Paul Hastings LLP, where he specialized in complex litigation, international arbitration, trade compliance, and national security law.

21. From April 2007 to December 2009, Plaintiff served as a senior associate for the law firm of King & Spalding LLP, where he specialized in complex litigation, trade compliance, and national security law.

22. From January 2010 to April 2012, Plaintiff served as Deputy Chief Counsel for the Advanced Research Projects Agency-Energy ("ARPA-E"), a new $200 million research and development ("R&D") agency within the U.S. Department of Energy that was modeled on the Defense Advanced Research Projects Agency ("DARPA"). For 18 months, Plaintiff served as Acting Chief Counsel of ARPA-E and supervised a team of attorneys and legal interns. Plaintiff played a leading role in the establishment of ARPA-E as a center of business excellence. Plaintiff received monetary awards in recognition of his superior performance.

23. During his tenure at ARPA-E, Plaintiff completed the Graduate School USA's Executive Potential Program, a 12-month leadership development program for high-potential executives.

24. In April 2012, Plaintiff received a noncompetitive, non-political appointment as Chief Operations and Strategic Innovation Officer (Chief Innovation Officer) for the Office of Energy Efficiency and Renewable Energy ("EERE"), a $2 billion research, development, demonstration, and deployment ("RDD&D") agency within the U.S. Department of Energy. In this capacity, Plaintiff directed nationwide and enterprise-wide business operations, to include acquisition, budget formulation and execution, environmental oversight, financial assistance, human resource services, information technology services, legal services, and national laboratory oversight. Plaintiff supervised several senior executives and staff directly, and he led a workforce of approximately 300 Federal employees and contractors in three states. Plaintiff led comprehensive business reforms at EERE and received the Secretary's

Appreciation Award for improvements to the agency's management and operations. Plaintiff received monetary awards in recognition of his superior performance.

25. During his tenure at EERE, Plaintiff completed the prestigious, one-month Leadership for a Democratic Society leadership development program at the Federal Executive Institute in Charlottesville, Virginia.

26. From April 2014 to April 2018, Plaintiff served as General Attorney for the U.S. Army Legal Services Agency, which is the largest law firm within the U.S. Department of Defense. Plaintiff served as one of the lead attorneys representing the consumer interests of the U.S. Department of Defense and all other Federal Executive Agencies before the Federal Communications Commission, the Federal Energy Regulatory Commission, and state public utility commissions in rate cases and regulatory proceedings concerning the electric, natural gas, and telecommunications sectors. Plaintiff advised military installations across the country on technology transitions in the energy and telecommunications sectors in order to ensure the reliability and resiliency of critical infrastructure. Plaintiff received monetary, on-the-spot, and time-off awards in recognition of his superior performance.

27. From April 2018 to October 2021, Plaintiff served as Associate General Counsel for the Missile Defense Agency, a $10 billion Defense agency within the U.S. Department of War. In this capacity, Plaintiff served as the lead attorney for appropriations, legislation, international law, and space law.

28. From 2018 to 2019, Plaintiff completed the necessary coursework for a LL.M in Air and Space Law at the University of Mississippi School of Law, but he delayed the completion of his thesis and the receipt of his degree until 2025.

**C. Hiring Process**

29. In or about August 2021, Plaintiff applied for the position of General Counsel at the Agency through USAJobs.gov. At the time of his application, Plaintiff did know anyone working at the Agency.

30. On August 20, 2021, Plaintiff participated in a first round interview with Associate General Counsel Nina-Belle Mbayu ("Mbayu"); Jeff Gilleo, Regional Portfolio Manager for East Africa and Southern Africa; Kate Ristroph, Regional Portfolio Manager for West and Central Africa; and Kwasi Donkor, Chief Strategy Officer. For the first round interview, Plaintiff successfully demonstrated his fluency in French, which was a requirement for the position.

31. On September 2, 2021, Plaintiff participated in a second round interview with Elisabeth Feleke, Chief Program Officer and Acting P/CEO; and Paul Olson, Senior Advisor for Programs.

32. During the application process and the interview process, Agency leadership and staff articulated the need for a seasoned attorney to serve as General Counsel. The Agency sought a seasoned attorney with broad experience in agency operations, who was fluent in French and willing to travel to Africa on a regular basis.

33. In a memorandum dated August 10, 2021, Mbayu identified the following functions that she had performed as Acting General Counsel since January 1, 2020:

- Manage and oversee legal affairs for USADF and serve as legal advisor to USADF's Board of Directors.

- Draft and interpret USADF legal documents according to relevant statutes, regulations and policies.

- Lead USADF Compliance and Due Diligence Review to ensure legal and regulatory compliance of USADF's grant agreements in French and English, with an annual budget of approximately $30 million.

- Review and approve USADF Implementing partner agreements, local country personnel contracts, and field office leases.

- Lead grant dispute resolution efforts related to grant audits and mismanagement of funds.

- Support USADF in defense of legal claims against the agency.

- Train Washington D.C. and Country Teams on compliance and due diligence requirements based on various legal and regulatory frameworks.

- Negotiate terms, draft, and manage $10 million portfolio of public-private partnership agreements, co-funding agreements with African governments, and other strategic partnerships.

- Manage and update USADF Policy and Manuals Library, and revise policies as appropriate.

- Manage database of local laws in African countries where USADF has field offices to support local country staff.

- Draft and review external communications to support USADF's External and Congressional Affairs teams.

- Lead USADF's Ethics Office as Acting Designated Agency Ethics Office (DAEO), including advising on ethical issues and host ethics trainings.

- Oversee USADF's Freedom of Information Act (FOIA) Program as USADF's Acting Chief FOIA Officer.

- Ensure submission of various annual, semi-annual, and quarterly U.S. federal government-wide agency reports.

In the same memorandum, Mbayu further identified the training that the new General Counsel would be required to complete to perform his duties and responsibilities:

- Supporting the ADF Board and Board Meetings

- Onboarding of new board member(s)

- ADF's Ethics Office/Program, past Disclosures, including Ethics training for Washington HQ and country teams, Ethics Training to the Board and Initial Ethics Training/Board 101 to the oncoming Board Member(s)

- Integrity.gov use

- GISEL functions currently only available to General Counsel (e.g., clearance of language amendments and Conditions Precedents)

- Current and future administrative and pre-/litigation proceedings against the agency

- Appropriations laws relevant to USADF

- FOIA Program and FOIA regulations

- Quarterly, semi-annual, and annual government-wide reports

- Country Protocol Agreements

- Strategic Partnership Agreements (negotiating terms with external partners with ADF mandate in mind)

- (In general) Institutional review of how ADF's mandate has been applied in the legal and general day-to-day operations of the agency

34. Plaintiff was hired as the General Counsel (Attorney-Advisor (General) (Bilingual), GS-0905-15) of USADF following a competitive selection process administered by the Agency's Human Resources service provider, the Interior Business Center ("IBC").

## D.  Employment by USADF

35. Plaintiff commenced employment on October 24, 2021 and served as General Counsel until July 2, 2022, when the conditions of his employment were rendered so intolerable by the Agency's discriminatory and retaliatory actions that he was constructively discharged.

36. Due to the COVID-19 pandemic, Plaintiff performed all work remotely between October 24, 2021 and January 21, 2022. During this period, Plaintiff performed his duties and responsibilities as General Counsel, including the negotiation of a settlement of ongoing litigation and the preparation of legal memoranda on various Agency matters.

37. At no point prior to his removal on January 21, 2022 did Plaintiff receive any counseling, discipline, or formal evaluations with negative performance feedback by the Agency. This unblemished record is directly inconsistent with the Agency's subsequent, post hoc characterization of Plaintiff as a disruptive employee whose removal was necessitated by his own conduct.

38. From the first days of his employment, Plaintiff demonstrated conscientious and proactive performance of his General Counsel duties. On November 4, 2021—his second week of employment—James, acting in her capacity as Chief of Staff, sent Plaintiff a Microsoft Teams message setting up his weekly one-on-one meetings with Feleke, bi-weekly Senior

Management Team meetings, and Senior Leadership Team ("SLT") meetings. This communication documents that Plaintiff was formally integrated into Agency leadership structure from the outset of his employment, directly contradicting any Agency characterization of Plaintiff as peripheral to or outside the SLT. On November 5, 2021, Plaintiff sent emails to both Feleke and James identifying several Agency compliance deficiencies he had already discovered in his first two weeks: (i) a statutory obligation to maintain an advisory committee under the ADF Act that was not being met; (ii) an Office of Government Ethics inspection of the Agency's ethics program that had been initiated in July 2021 without corrective action; and (iii) a legal obligation for Board members to file annual confidential financial disclosures, which a 1996 Board resolution had unlawfully purported to waive. The emails in the chronology reflect that Feleke was initially receptive to all three of these concerns: she agreed to re-establish the advisory committee, connected Plaintiff with Board Chairman Leslie to complete his financial disclosure, and acknowledged the need for remediation of the ethics deficiencies. James participated in the discussion of each item and was formally involved in implementing the responses.

### E.  The Internal Investigation

39. On November 12, 2021, Plaintiff learned from Senior Advisor Paul Olson of certain allegations relating to former P/CEO CD Glin and Vice Chair John Agwunobi posted on the website Glassdoor.com. Agency leadership was already aware of the negative posts on Glassdoor.com and had considered paying the website to remove them—an approach that would have concealed rather than addressed the underlying concerns. Plaintiff correctly assessed that failure to investigate these allegations could expose the Agency to scrutiny by the Office of Inspector General ("OIG") within the U.S. Agency for International

Development ("USAID"). As Plaintiff advised in writing: "If we do not act proactively to investigate these allegations, there is a risk, hard to quantify, that at some point a current or former disgruntled employee (or anyone with access to Glassdoor.com) will refer these allegations to the USAID OIG. The OIG will not regard us favorably if they believe that we tried to sweep such allegations under the rug." This professional legal assessment was confirmed by subsequent events: USAID OIG did in fact open an investigation.

40. On November 13, 2021, Plaintiff sent an email to Feleke recommending an internal investigation to address the allegations posted on Glassdoor.com. The internal investigation was to include, among other matters, potential EEO violations.

41. On November 15, 2021, Feleke discussed Plaintiff's recommendation with him and authorized Plaintiff to conduct the internal investigation. Feleke spoke to the entire leadership team individually to ensure they cooperated fully with the investigation. When asked in her deposition whether she authorized the investigation, Feleke testified, "Yes." However, Feleke denied Plaintiff's request to engage a contractor to assist in the investigation.

42. For the internal investigation, Plaintiff interviewed numerous Agency personnel and collected and reviewed internal documents. Plaintiff acted under a reasonable, good-faith belief that the workplace conduct he was investigating violated or could become a violation of Title VII. Critically, Plaintiff specifically distinguished, in his interviews, conduct falling within the EEO laws from other workplace concerns—demonstrating that his investigation was directed in part at potential violations of anti-discrimination statutes.

43. Through the internal investigation, Plaintiff concluded that there was substantial evidence of potential EEO violations, including a toxic work environment under former President and

CEO Glin. This is supported by video-recorded interviews of multiple witnesses who described employees crying, becoming physically ill, and experiencing severe anxiety, nightmares, and PTSD-like symptoms as a result of Glin's management—conduct that plainly exceeds the level of ordinary workplace friction and that Plaintiff, as an experienced Federal attorney, reasonably assessed as implicating the anti-discrimination statutes.

44. Among the Agency personnel interviewed by Plaintiff was Elizabeth DeFreest ("DeFreest"), who served as Special Assistant to CEO Glin and managed the Agency's Office of the President, provided detailed testimony that confirms the severity of the hostile work environment Plaintiff's investigation documented. DeFreest testified that Glin would respond to routine administrative failures by pounding his fists on his desk, and told DeFreest directly that he did not want "explanations" from her—only results. DeFreest described finding herself in tears in the Agency bathroom as a direct result of Glin's treatment, and recounted that a senior staff member who found her there subsequently confronted Glin and told him "you can't treat people like that." DeFreest further testified that she has experienced PTSD-like symptoms as a direct result of her working environment under Glin, including anxiety triggered by any mention of his name, difficulty expressing opinions in group settings, and hypervigilance to criticism that has materially affected her personal relationships outside the workplace. DeFreest stated that she was actively seeking professional therapy to address the trauma she suffered during her tenure. DeFreest further stated that she was in such fear of Glin that she went to the bathroom on herself at her desk. Working conditions that reduced a dedicated senior staff member to tears, produced clinically recognizable trauma symptoms, and required professional therapeutic intervention as merely "common workplace occurrences."

- 14 -

45. James, herself one of the Agency officials who participated in discriminating and retaliating against Plaintiff, provided sworn testimony during the internal investigation that independently corroborates the toxic work environment Plaintiff documented. James acknowledged that she would lean toward characterizing the work environment under Glin as toxic. She confirmed that Glin's conduct caused employees to cry—specifically confirming that she personally observed DeFreest being brought to tears as a result of Glin's treatment. James confirmed that Glin would make dismissive and demeaning public comments about colleagues in group settings, including turning to James during a Senior Management Team meeting and stating of Zahui: "See, I told you he's sloppy." The public humiliation of a CFO-level official before his peers and supervisors is not a "common workplace occurrence"—it is precisely the kind of conduct that Plaintiff, as a reasonable attorney, assessed as implicating the Agency's anti-harassment obligations. James confirmed the high turnover of chief operating officers. James further confirmed that Glin operated in a manner fundamentally inconsistent with his stated commitment to inclusive leadership.. Critically, James was a direct participant in the internal investigation that constitutes Plaintiff's protected EEO activity: she was interviewed by Plaintiff as part of that investigation, was aware of its scope and findings, and participated in the subsequent Agency leadership discussions that culminated in the discriminatory and retaliatory actions against Plaintiff.

46. Zahui also provided video-recorded testimony during the internal investigation. On the toxic work environment, Zahui acknowledged that Glin's practice of intensely challenging subordinates in briefings caused employees to feel demeaned and humiliated, and confirmed that Glin had personally subjected Zahui himself to conduct that Zahui found "inappropriate." The admission by the Agency's own CFO and principal retaliatory actor that

Glin subjected even him to conduct he found inappropriate is direct evidence that the hostile environment Plaintiff investigated was real, pervasive, and not "common workplace occurrences."

47. Grants Management Specialist Yael Nagar, who had been employed at USADF since March 2016, provided video-recorded testimony during the internal investigation that independently and substantially corroborates the toxic work environment violations Plaintiff identified. Nagar confirmed unequivocally that a toxic work environment existed under Glin. Nagar specifically confirmed that Glin engaged in yelling and screaming at Agency staff in front of colleagues, including a fifteen-minute public screaming episode at his very first biennial portfolio review. Finally, Nagar described a pattern of institutional governance failure that prevented any internal check on Glin's conduct, confirming Plaintiff's allegation that the Agency's governance structure provided no legitimate internal mechanism through which employees could raise EEO concerns.

48. Mbayu, who served as Acting General Counsel from January 2020 through October 2021, provided video-recorded testimony during the internal investigation that corroborates Plaintiff's findings with respect to the toxic work environment. Mbayu confirmed that a toxic work environment existed under Glin, testifying directly: "yes" when asked whether she would characterize the environment as toxic. She described experiencing severe physical manifestations of workplace stress before her one-on-one meetings with Glin, including waking from sleep in pools of sweat. Mbayu testified that she began seeking therapy to address workplace stress.

49. Regional Program Manager Jeff Gilleo, who served as a senior program officer at USADF, provided detailed sworn testimony that independently corroborates the toxic work

environment. Gilleo testified unequivocally: "Yes, absolutely" when asked if a toxic work environment existed under Glin. He characterized Glin as a "narcissistic bully" who "prided himself" on being "combative, disruptive, abrasive." Gilleo specifically identified, by name, numerous employees who departed USADF as a direct result of Glin's conduct, including Kim Ward (a regional director with approximately twenty years of service, "driven into the hospital" by Glin's bullying), Tom Coogan, David Blaine, Matthew Howie, Regina Neal, Elizabeth DeFreest, Anne Griffin, Maura Fulton, and Ellington Arnold. Regarding the Agency's governance failures, Gilleo confirmed that Glin "controlled the narrative" to the Board and that the Board "never seemed to care" about staff departures.

50. Regional Program Manager Kate Ristroph, who left USADF in 2018 to attend graduate school and returned in November 2020, providing her with a unique comparative vantage point on how the Agency changed under Glin's leadership, also provided video-recorded testimony during the internal investigation. Ristroph confirmed that when she returned to USADF in November 2020 she found an organization structurally and culturally degraded from the one she had left, with the training function eliminated, the knowledge learning department dismantled entirely, and cycle targets unknown to current staff.

51. Multiple witnesses confirmed serious and ongoing EEO-related concerns under former CEO Glin's tenure, including descriptions of a toxic work environment, instances of yelling, belittlement, and conduct causing employees significant physical and emotional distress. These witnesses described far more than "common workplace occurrences" that do not implicate Title VII. The video-recorded accounts of multiple witnesses—to include DeFreest, James, Zahui, Nagar, Mbayu, Gilleo, and Ristroph—each of whom, independently and from different vantage points within the organization, confirmed the same pattern of abusive, fear-

inducing management by Glin. The witnesses described conduct—including employees becoming physically ill, suffering nightmares and PTSD-like symptoms, waking in pools of sweat before scheduled meetings, resigning for mental health reasons, and being driven to seek therapy—that goes materially beyond what has historically been characterized as ordinary workplace friction.

52. Feleke prematurely terminated the internal investigation before it was completed. During the week of Thanksgiving 2021, Feleke informed Plaintiff—without prior notice—that she was ending the investigation. Plaintiff had been in the middle of conducting interviews and had additional interviews scheduled. Feleke refused Plaintiff's request to continue the investigation. In terminating the investigation, Feleke further instructed Plaintiff to omit any evidence of misconduct and wrongdoing from his report and to limit the report to forward-looking recommendations—directing Plaintiff, in effect, to suppress and conceal the findings of his investigation. This directive was itself an unlawful interference with the EEO process.

53. Plaintiff believed Feleke cut short the internal investigation to prevent Plaintiff from discovering potential EEO violations, as Feleke, James, and Zahui were themselves implicated—having facilitated, participated in, or failed to oppose EEO violations during and after Glin's tenure.

54. On December 1, 2021, at Feleke's direction, Plaintiff submitted a preliminary internal investigation report to Feleke and subsequently to Board Chairman Jack Leslie. The report concluded that a toxic work environment existed at the Agency. Feleke took no action on the findings. In addition to the preliminary investigation report, Plaintiff reported potential EEO violations to Feleke by text, email, telephone, videoconference, and in person before he was placed on administrative leave on January 21, 2022.

55. A verbatim transcript of Feleke's December 2, 2021 meeting with Plaintiff—in which Feleke conveyed the Board Chairman's response to the Internal Investigation Report—provides direct, contemporaneous evidence of the Agency's effort to suppress Plaintiff's investigation findings and restrict his General Counsel functions. In that meeting, Feleke transmitted the Board Chairman's position that he was "not interested in continuing further investigation" into any of the findings, including the finding of a toxic work environment, which the Board Chairman described as "not something that's unique to USADF." Critically, the transcript further shows that during this same meeting, when Plaintiff attempted to discuss the structural independence of the General Counsel's office, Feleke responded by stating: "you need to adopt whatever management and organizational culture that we have here."

56. On December 2, 2021—the day after Feleke directed him to halt his investigation—Plaintiff disclosed the preliminary results of his investigation, including evidence of the violations of law described above, to the U.S. Agency for International Development's ("USAID") Office of Inspector General ("OIG"). Plaintiff continued to provide information and documentation to USAID OIG through July 2, 2022, and on information and belief, USAID OIG opened a criminal investigation.

57. Plaintiff also reported potential EEO violations to Adkins in January 2022. These activities—conducting an internal investigation of potential EEO violations, reporting potential EEO violations to Agency management, opposing perceived EEO violations, and seeking access to the EEO complaint process—constitute protected EEO activity under Title VII. The Agency admitted in discovery, in response to Admission Request 2, that "Plaintiff engaged in protected EEO activity."

58. Title VII's opposition clause protects opposition to practices that are ongoing or that could become violations--an employer remains responsible for the effects of a predecessor's discriminatory culture on continuing employee. Moreover, nothing in the law requires that the subject of an investigation remain employed at the agency in order for the investigation to receive Title VII protection.

### F.  Reprisals against Plaintiff for Engaging in Protected EEO Activities

59. In February 2022—immediately after Plaintiff initiated the EEO complaint process—the Agency commissioned a third-party investigation into Plaintiff through the U.S. Postal Service's National EEO Investigative Services Office ("NEEOISO"), case number USADF-22-HCI-001. The investigation was initiated by Zahui and purported to investigate whether Plaintiff had subjected Agency employees to workplace harassment based on race and sex. The investigation identified five vague allegations, all with "unspecified dates to be determined." Critically, and by explicit Agency request, the investigator was instructed not to interview Plaintiff—the very person accused of misconduct. The investigative report itself documents this extraordinary procedural defect in a Fact Finder's Note: "Mateo Dunne the alleged harasser in this complaint was not interviewed per Agency request." The Agency has never offered a legitimate explanation for this instruction. Conducting a misconduct investigation without interviewing the accused employee is fundamentally inconsistent with any legitimate investigatory purpose and is compelling evidence that the investigation was designed not to find the truth but to manufacture a paper record to justify Plaintiff's removal. The Agency's own discovery responses confirm that it was Zahui himself who directed Plaintiff's exclusion.

60. The timing and circumstances of the Agency's retaliatory investigation confirm its pretextual nature. In a contemporaneous memorandum to the Board of Directors prepared in February 2022—the same month the NEEOISO investigation was initiated—Adkins explicitly stated that the Agency would initiate a harassment investigation to counter "a likely EEO case from Mr. Dunne" and would also conduct an EEO investigation if Plaintiff "files a case against the agency." Zahui, who served as the nominal complainant in the NEEOISO investigation, was asked under oath in his deposition whether the statements in that paragraph of Adkins's Board memorandum were inaccurate or untrue. Zahui testified: "From what I can remember, not—none is untrue." Thus the Agency's own documentary record, confirmed under oath by the official who initiated the NEEOISO complaint, establishes that the USPS harassment investigation was initiated as a strategic instrument to counter Plaintiff's anticipated EEO complaint—not as a legitimate workplace investigation.

61. The NEEOISO investigative report (USADF-22-HCI-001) is replete with internal contradictions and deficiencies that further expose its pretextual character. Mbayu—one of the witnesses in the investigation and the only Federal employee who reported directly to Plaintiff—testified that she had not been subjected to harassment, bullying, or intimidation by Plaintiff and had no first-hand knowledge of Plaintiff subjecting other staff to such treatment. Mbayu further acknowledged that Plaintiff "did see legitimate issues within the agency" even if she believed his approach was not always ideal. DeFreest, who as Special Assistant was arguably the Agency employee with the most sustained and direct exposure to both Plaintiff's conduct and Agency operations during the relevant period, categorically confirmed that she did not experience harassment by Plaintiff. Her Microsoft Teams

communications with Plaintiff are affirmatively warm in tone, directly contradicting any characterization of Plaintiff as creating a hostile or harassing work environment.

62. The investigative witnesses' testimony in USADF-22-HCI-001 confirms, rather than undermines, many of the core facts supporting Plaintiff's claims. Feleke's own testimony in that proceeding acknowledged that Plaintiff had a "contentious" relationship with Zahui because Plaintiff "wanted to insert another layer of approvals and clearance rights on a number of financial operations." This admission directly corroborates Plaintiff's allegation that Zahui falsely restricted Plaintiff's procurement oversight authority to obstruct his legitimate oversight functions—and it takes on unmistakable significance in light of Zahui's subsequent criminal conviction for the very procurement misconduct Plaintiff sought to address. Feleke further admitted that Plaintiff advised her that interference with his investigation constituted potential obstruction of his General Counsel functions.

**G.  Issue 1: Zahui's False Restriction of Plaintiff's Procurement Oversight Authority**

63. On November 19, 2021, less than a month into Plaintiff's employment, CFO Zahui informed Plaintiff, in a confrontational meeting, that reviewing Agency procurement contracts was "not in Plaintiff's job description." This characterization was false. Plaintiff's position description explicitly includes responsibility for "reviewing financial disclosure and outside activities reports," and as General Counsel of a Federal agency, Plaintiff has inherent authority and professional responsibility to advise on procurement matters and compliance with applicable Federal regulations. A verbatim transcript of that November 19, 2021 meeting demonstrates, as a matter of undeniable documentary fact, the precise conduct Zahui engaged in. When Plaintiff notified Zahui that specific procurement actions—including placing DeFreest on micropurchase and placing Anjana Turner on micropurchase on multiple

consecutive occasions—were "unlawful" and "illegal," Zahui's initial response was not to dispute the characterization or to propose corrective measures--it was to challenge Plaintiff's authority to raise the issue at all. Zahui's subsequent criminal conviction for accepting gratuities from a government contractor provides direct and compelling evidence of his motive to obstruct Plaintiff's procurement review authority.

64. Zahui did not simply inform Plaintiff that his request required authorization. The confrontational and hostile manner of Zahui's refusal, combined with his false characterization of Plaintiff's authority, constituted an adverse action in the context of Plaintiff's employment and was the first in a series of actions designed to obstruct Plaintiff's General Counsel duties. Plaintiff also specifically notified Zahui in the meeting of his "affirmative obligation, as an employee of the federal government and as an attorney for the federal government, to report fraud, waste and abuse," and stated that if the violations were not resolved, he would be required to report them "internally or externally." This notification constitutes protected EEO activity occurring during the November 19, 2021 meeting itself. Zahui's response—continued resistance to OGC oversight—followed by his subsequent participation in the effort to remove Plaintiff from the Agency, is direct evidence of reprisal motivated by Plaintiff's exercise of his reporting obligations.

65. After the November 19, 2021 meeting, Zahui did not fulfill his stated commitment to provide Plaintiff with documentation of USADF's procurement processes, identify the areas of OGC oversight he opposed, or schedule a meeting with the Bureau of Public Debt. On December 6, 2021, Plaintiff sent an email to Zahui, Feleke, and Mbayu formally requesting USADF's contract with the Bureau of Public Debt, Finance/Admin policies and procedures, and a detailed budget. Feleke's December 11, 2021 response is a pivotal document in this record.

In that email, Feleke stated definitively: "The intent is not to add an additional layer of GC clearance to a process that management already feels is detailed and thorough." This written statement by the Acting CEO—issued after Plaintiff had delivered his investigation report finding multiple instances of procurement misconduct—constitutes a formal, documented, management-level denial of Plaintiff's procurement oversight authority. The Agency has never explained how this instruction is consistent with Plaintiff's professional obligations as a Federal attorney, with his position description, or with applicable Federal law.

66. The chronology further documents that between November 19 and December 31, 2021, Zahui, Feleke, and James engaged in a coordinated pattern of micro-surveillance and obstruction of Plaintiff's General Counsel functions that extended far beyond the procurement dispute. The email record reflects: (a) On December 2, 2021, Feleke, James, and Zahui escalated a dispute about whether USADF's periodic gatherings at which alcohol was served complied with Federal workplace alcohol regulations, with James accusing Plaintiff of failing to "acclimate" to USADF culture rather than engaging with the legal substance of his compliance concern. (b) On December 3, 2021, Board Chairman Leslie replied to Plaintiff's introductory email directing Plaintiff to work through Feleke and Adkins; the email was copied to incoming CEO Adkins, placing him on notice of the contested relationship between the General Counsel and Agency leadership six weeks before his first day. (c) On December 3, 2021, Feleke sent Plaintiff an organizational chart emphasizing that the GC had "a direct reporting responsibility to the Office of the President/CEO"—a warning that Plaintiff's attempt to establish an independent working relationship with the Board would not be tolerated. (d) By December 12, 2021, the cumulative effects of the retaliation by Feleke, James, and Zahui had already caused Plaintiff to text Mbayu that he was "beginning to

rethink my position at USADF." This contemporaneous text message, sent six weeks before his removal, establishes that Plaintiff began experiencing the hostile work environment created by Feleke, James, and Zahui as early as December 2021.

**H.  Issue 2: Chastisement for Contacting Former CEO Regarding Financial Disclosures**

67. On January 5, 2022, Feleke emailed Plaintiff asking him to "kindly explain" why he had directly contacted former CEO C.D. Glin regarding his failure to file public financial disclosures. Feleke's email was not a neutral inquiry; it was a rebuke delivered in the context of an escalating pattern of interference with Plaintiff's General Counsel functions. Plaintiff had independent legal and ethical obligations, as General Counsel, to ensure the Agency's compliance with Federal financial disclosure laws. Feleke's instruction not to contact Glin directly about his legally required financial disclosures was itself an instruction to circumvent Plaintiff's compliance obligations. This communication was incorporated into the 76-page Information Memorandum that Agency officials used to justify Plaintiff's removal and placement on administrative leave just sixteen days later. A communication that management officials themselves used as evidence of insubordination to justify an indefinite suspension clearly might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

68. The chronology documents that the January 5, 2022 chastisement was the culmination of a multi-week dispute in which Feleke, James, and Zahui systematically attempted to interpose themselves between Plaintiff and former CEO Glin on the financial disclosure matter. On January 4, 2022, Plaintiff sent an email to Feleke, James, and Zahui providing formal written notice that, as Designated Agency Ethics Official ("DAEO"), he had consulted with the Office of Government Ethics ("OGE") and was required to obtain the

missing disclosures and a monetary penalty of $200 per missing disclosure from Glin. Feleke's response asked that James and Zahui contact Glin directly rather than Plaintiff—expressly interposing two non-DAEO officials into a legal compliance matter over which Plaintiff had exclusive statutory authority. On January 5, 2022, Plaintiff sent a formal written notification to Feleke, James, and Zahui, stating that he had confirmed with OGE that he, as DAEO, had "exclusive authority and responsibility for communicating with CD Glin regarding his missing public financial disclosures," and explicitly asking them to "advise if you will desist in your interference." The proximity in time between Plaintiff's OGE-backed notification of interference and Feleke's chastisement is itself strong circumstantial evidence of retaliatory motive.

## I.    Issue 3: Removal from Senior Leadership Team

69. On January 19, 2022—one day after Adkins was sworn in as President and CEO—Plaintiff was notified by James that he would no longer participate in the Senior Leadership Team ("SLT"). Feleke had added Plaintiff to the SLT at the commencement of his employment, recognizing that the General Counsel's participation in strategic planning was appropriate and beneficial. This was not the mere restructuring of an "informal group." Plaintiff was expressly added to the SLT by Feleke precisely because of his role as General Counsel—his exclusion upon Adkins's arrival was therefore a targeted decision to marginalize Plaintiff specifically, not a neutral restoration of the status quo. That Adkins effected this exclusion on his first day in office—before he had worked a single day with Plaintiff—supports the inference that it was a predetermined measure, not a considered judgment about Plaintiff's qualifications.

70. The specific language of James's January 19, 2022 SLT exclusion email is independently significant. James wrote: "The SLT under Travis' tenure, and until further notice, will be comprised of the following positions: P/CEO; Chief of Staff and Director of External Affairs; Director of Finance/Admin and CFO; Chief Program Officer; Senior Advisor; Chief Strategy Officer. The Office of the General Counsel will be called upon for specific consultation and advisement instead of the broad strategic and development program planning of the agency writ large for which SLT is responsible." The email was issued on January 19, 2022—the day after Adkins's swearing-in, before Adkins had conducted a single substantive meeting with Plaintiff—was sent by James (a principal participant in the preceding retaliatory conduct) rather than by Adkins himself, and explicitly named which positions would constitute the SLT, conspicuously omitting the General Counsel while including positions held by all three of the officials who had participated in the preceding months of retaliation against Plaintiff.

71. On January 19, 2022, James also sent Plaintiff two separate emails routing his AWS and telework requests to Adkins as his new supervisor, while directing all other staff requests through their respective supervisors. These administrative routing emails established that James was actively constructing an administrative structure in which Plaintiff was isolated from the leadership team. The next day, January 20, 2022, Plaintiff sent Adkins an "Urgent Request for Meeting" in which he described the preceding months of retaliation by Feleke, James, and Zahui in explicit terms. Adkins's response to this written notification of ongoing retaliation was to place Plaintiff on administrative leave two days later. That response—placing a General Counsel who had just reported retaliation on indefinite administrative leave, without interviewing any of the three

officials accused, without conducting any independent assessment, and without providing Plaintiff any opportunity to respond to counter-allegations—is not consistent with legitimate employment management.

**J.  Issue 4: Removal and Placement on Involuntary Administrative Leave**

72. On January 21, 2022—three days after Adkins was sworn in as P/CEO, and before Adkins had worked a single full day with Plaintiff—Plaintiff was placed on involuntary administrative leave. The stated basis for the administrative leave was "pending completion of an investigation related to allegations of misconduct." No allegations were identified. No investigation had been commissioned. Adkins did not provide Plaintiff with advance notice, an opportunity to respond, access to any evidence, or any of the due process protections required by the Agency's own misconduct policy (MS-327). A verbatim transcript of the January 21, 2022 meeting between Adkins and Plaintiff confirms the coercive and procedurally deficient character of that meeting. When asked by Dunne "Will I be provided at some point information on the specific allegations that are being made against me and how I can defend myself against those allegations," Adkins falsely responded "Yes." Adkins stated that the administrative leave was "indefinite" and constituted "a first step in an adverse action." This characterization—made on the record by the Agency's own P/CEO in the meeting itself—directly refutes any assertion that the administrative leave was a neutral, procedurally proper step that fell short of an adverse action.

73. Adkins later claimed that IBC recommended placing Plaintiff on administrative leave. This claim is directly contradicted by the sworn testimony of IBC's own Employee Relations Specialist, Suzanne Becker. When shown the Agency's written characterization

that Adkins placed Plaintiff on administrative leave "per the recommendation of IBC," Becker testified flatly: "No." She further testified: "The decision by ADF to place Mr. Dunne on administrative leave was ultimately their decision—it was part of what was discussed with Mr. Cummings and Mr. Adkins and myself as something that Mr. Adkins wanted to move forward with." Becker also independently observed in writing that there was a "close proximity in time" between Plaintiff's USAID OIG filing and his placement on administrative leave—an acknowledgment by the Agency's own HR service provider that the administrative leave decision bore the hallmarks of retaliation. The predetermination of Plaintiff's removal is further confirmed by Zahui's January 7, 2022 "do over" email.

74. Adkins claimed that he was responding in good faith to a 76-page compilation of staff complaints against Platintiff. That document was assembled by Feleke, James, and Zahui—an official who had a direct personal and criminal interest in discrediting the General Counsel who had identified his procurement misconduct. Adkins received this document on January 18, 2022—the first day of Adkins's tenure—before Adkins had any opportunity to independently assess Plaintiff's conduct, observe Plaintiff's work, or hear Plaintiff's perspective. The 76-page document was never provided to Plaintiff, depriving him of any opportunity to respond. Compounding the document's inherent unreliability, it incorporated complaints from former CEO Glin—the very subject of Plaintiff's internal investigation—who had complained to Adkins that Plaintiff's authorized emails seeking compliance with financial disclosure obligations constituted "harassment." Adkins's reliance on a complaint from the subject of an ongoing EEO investigation to justify adverse action against the investigator is itself evidence of retaliatory intent.

- 29 -

**K.  Issues 5, 6, and 9: The Cease-and-Desist Order, Equipment Return, and Denial of Due Process**

75. On January 28, 2022—the same day Plaintiff delivered his Internal Investigation Report to Adkins and requested a written explanation for the administrative leave and an opportunity to respond—Adkins responded by issuing a cease-and-desist memorandum (or gag order) threatening Plaintiff with disciplinary action if he failed to comply. This memorandum instructed Plaintiff not to contact any USADF employees except Adkins. A memorandum that threatens an employee with disciplinary action and prohibits contact with colleagues would unquestionably dissuade a reasonable employee from pursuing EEO rights. The Agency's own communications demonstrate that it considered the cease-and-desist order a mechanism to prevent Plaintiff from contacting staff who might provide information or support in connection with his anticipated EEO complaint. Adkins forwarded Plaintiff's email requesting EEO counselor information to IBC, characterizing it as "a message from Mr. Dunne to another USADF colleague—in violation of our cease-and-desist notification." Becker's own written communication in response stated that the email appeared to be "a reach out about EEO, although it could be a violation of the cease and desist," and that she would "not recommend to address at this time."

76. On January 29, 2022—one day after Adkins issued the cease-and-desist memorandum—Plaintiff sent a written settlement proposal to Adkins, expressly identified as confidential and for settlement purposes only. In that communication, Plaintiff formally and in writing identified Adkins, Feleke, James, and Zahui by name as having "retaliated against me (as a whistleblower) for engaging in protected activities" under Federal law. This written

notice constitutes an additional act of protected EEO activity that was communicated directly to all five named officials.

77. On February 1, 2022, Plaintiff sent a follow-up email to Adkins  formally requesting return to duty status and providing written notice that Plaintiff had disclosed the internal investigation report to USAID OIG on December 4, 2021. This email placed Adkins on direct written notice that Plaintiff was a cooperating witness in an active federal criminal investigation involving conduct at the Agency. Adkins's response was to maintain Plaintiff on administrative leave for five more months.

78. On or about February 2, 2022, Plaintiff received three boxes and a letter instructing him to return his computer equipment, along with an Exit Clearance Form used only for separating employees. There is no evidence that the equipment return is standard procedure applicable to any employee on administrative leave. That characterization is refuted by comparative evidence: Mbayu participated in the same internal investigation as Plaintiff but was not placed on administrative leave, was not instructed to return her computer equipment, and did not receive an Exit Clearance Form. The differential treatment of Plaintiff—the only Caucasian/white participant in the investigation—is direct evidence of racial discrimination.

79. The specific circumstances of the February 2, 2022 equipment return further establish Zahui's personal role as an executor of the retaliatory adverse actions against Plaintiff. Zahui, acting in his capacity as CFO, sent Plaintiff three boxes with a letter instructing immediate return of government-furnished equipment by February 8, 2022, and explicitly threatening paycheck deductions for non-compliance. This letter was accompanied by an Exit Clearance Form—a document that, in USADF's standard practice, is used

exclusively for employees departing the organization. Additionally, the same day the equipment was received, CIO Chi emailed Plaintiff stating "I was informed that you no longer work at USADF." This email further confirms that Adkins had communicated to his staff that Plaintiff was no longer employed at the Agency, consistent with the predetermined removal plan documented by Zahui's January 7, 2022 "do over" email.

80. Plaintiff made repeated requests for due process on February 5, February 10, February 14, February 21, March 21, April 20, May 24, and June 9, 2022—eight separate requests over a five-month period—asking Adkins to identify the specific allegations of misconduct, provide access to the underlying evidence, and afford Plaintiff the due process to which he was entitled as a Federal employee. Adkins never responded to any of these eight requests. Federal regulations and Agency policy impose affirmative obligations on agencies with respect to administrative leave, including the requirement to advise employees of the basis for such leave and to provide a reasonable opportunity to respond. An agency cannot circumvent these requirements by the simple expedient of maintaining an employee on indefinite leave based on unspecified allegations.

### L.  The Extensions of Administrative Leave

81. On February 25, 2022, Plaintiff received a memorandum  extending his administrative/investigative leave for another thirty business days. On April 10, 2022, Plaintiff received a second memorandum  extending his administrative/investigative leave for another thirty business days. In total, Adkins maintained Plaintiff on involuntary administrative leave for approximately 162 days—from January 21, 2022, to July 2, 2022—which was nearly three times as long as Plaintiff had actually worked at the

Agency prior to Adkins's swearing-in. IBC did not recommend any extension of Plaintiff's administrative leave.

82. Becker, the IBC Employee Relations Specialist assigned to the Agency, testified that she was unaware of any other instances of Federal employees being maintained on involuntary administrative leave for more than 160 days. When asked whether she was aware of involuntary administrative leave existing for longer than 160 days, Becker testified: "In my experience, no"—confirming that Plaintiff's administrative leave was, in the experience of the Agency's own HR service provider, extraordinary and unprecedented. Moreover, Becker testified that IBC did not recommend extending Plaintiff's administrative leave. The extraordinary duration of the leave—far beyond any reasonable period for a workplace investigation, and far beyond anything Becker had ever encountered in her professional experience—confirms that Plaintiff's removal was the Agency's predetermined objective. When Mbayu resigned effective April 1, 2022, leaving the Agency without any Federal employee attorneys to perform inherently governmental functions, Adkins refused to return Plaintiff to duty status. Feleke's deposition testimony confirms this conclusion: asked whether she had a belief that Plaintiff would eventually return to his position as General Counsel, Feleke testified: "That was not under consideration."

83. Adkins also failed to issue a mandatory report to Congress with respect to Plaintiff's involuntary administrative leave as required by 5 U.S.C. § 6329b(d). This statutory violation is further evidence that the administrative leave was not conducted in accordance with applicable law and was not a legitimate personnel action.

**M. Further Reprisals**

- 33 -

84. On information and belief, commencing no later than 2022, the Agency publicly made false and defamatory statements about Plaintiff, including but not limited to a March 14, 2025 press release.

85. On June 15, 2022, when Plaintiff informed the Agency that he had accepted an offer to join the Federal Energy Regulatory Commission ("FERC"), Adkins devised a scheme to damage Plaintiff's reputation with his prospective employer. Specifically, Adkins wrote to IBC that he would "prefer that a message notifying FERC of Mr. Dunne's attitude, behavior, and dishonesty in this process comes from IBC," and warned that if IBC would not take up that function, "USADF will have to take the matter into its own hands," adding: "We do intend for FERC to be made aware of Mr. Dunne's conduct in this matter." This scheme was documented in Adkins's own written communications. The scheme to interfere with Plaintiff's prospective employment constitutes a materially adverse action that would dissuade any reasonable employee from exercising EEO rights.

86. The Agency's retaliatory removal of Plaintiff left it operating without any Federal employee attorneys for 332 days following the subsequent resignation of Mbayu on April 1, 2022. Without Federal employee attorneys, there was no one with the inherent authority to perform inherently governmental legal functions including personnel, contracting, ethics, and FOIA matters. The Ranking Member of the U.S. Senate Foreign Relations Committee noted in a November 2023 letter that USADF appeared to be "the only federal agency to operate without a full-time senior legal team responsible for compliance and oversight for such a prolonged period of time." That the Agency was willing to suffer this operational damage rather than return Plaintiff to duty is itself compelling evidence that Adkins's objective was reprisal.

- 34 -

87. On July 2, 2022, Plaintiff separated from the Agency. Plaintiff's separation was a constructive discharge: the Agency's failure to identify allegations, provide access to evidence, advise on the status of the investigation, or provide any due process—confirmed by Feleke's testimony that Plaintiff's return "was never under consideration"—made continued employment impossible and intolerable. Plaintiff commenced a new position as a Trial Attorney with the Federal Energy Regulatory Commission on July 3, 2022.

## N. Adkins' Unlawful Racial Animus

88. Jasmine Battle served as Special Assistant to Adkins from February to September 2022—throughout the period during which Adkins maintained Plaintiff on involuntary administrative leave. Battle is a Black female. Battle informed Plaintiff that he was placed on involuntary administrative leave because of his race and color. On at least three separate occasions, Adkins told Battle that he wanted his direct reports—including the General Counsel—to consist exclusively of Black people. The content of Battle's affidavit was confirmed when, during Adkins's own deposition, Adkins was asked to read Paragraph 4 aloud: "On at least three occasions, Mr. Adkins told me that he wanted his entire team (to include the General Counsel) to consist only of Black people. He wanted all of his direct reports to be Black." Adkins was then asked: "Is this true?" Adkins answered: "No, it's not." The Agency has offered no explanation for why Plaintiff alone, among all employees involved in the internal investigation, was subjected to the full panoply of adverse actions, while Mbayu and contractor attorney Anjana Turner—both Black—were not placed on administrative leave, were not issued cease-

and-desist memoranda, were not instructed to return their computer equipment, and were not subjected to third-party investigations.

89. When the Agency sought to hire a new HR specialist, Adkins insisted that the Agency hire a Black person, and the Agency complied by hiring a Black female, Sheila Hicks-Martin. Adkins ultimately achieved his stated objective of having his direct reports consist exclusively of Black people. On February 27, 2023, Adkins hired Kerline Perry, a Black female, as General Counsel—the first person to serve in that role since Plaintiff's departure on July 2, 2022, a gap of more than eight months during which the Agency operated without any Federal employee attorneys. The Agency has offered no explanation for why Plaintiff alone, among all employees involved in the internal investigation, was subjected to the full panoply of adverse actions.

90. Battle's account is not an isolated allegation. It is corroborated by Adkins's subsequent conduct in assembling a team of exclusively Black direct reports, by his direction to hire a Black HR specialist, by his selection of a Black female as General Counsel after Plaintiff's departure, and by the complete absence of any adverse action against Black employees who engaged in substantially identical conduct alongside Plaintiff. The pattern of Adkins's personnel decisions, taken together with Battle's sworn account, establishes a racially discriminatory intent that no denial alone can overcome.

### O. Summary of Pretext Evidence

91. The following facts and evidence, individually and collectively, establish that the Agency's proffered justifications for its adverse actions were pretextual and that its actions were motivated by race discrimination and retaliation for Plaintiff's protected EEO activities:

(a) The predetermination of Plaintiff's removal is established by multiple independent pieces of evidence: (i) on January 7, 2022—eleven days before Adkins was sworn in—CFO Zahui emailed IBC explicitly stating that "the Board and the incoming President would like to explore the possibilities of a do over" of the General Counsel hiring; (ii) Adkins denied in deposition that he communicated with Zahui or Feleke about the General Counsel hiring before his swearing-in, a denial directly contradicted by Zahui's own January 7 email; and (iii) IBC's Becker interpreted the "do over" language as reflecting concerns about the new general counsel that predated Adkins's first day in office—collectively demonstrating that the adverse actions were predetermined and not responsive to any employee complaint;

(b) IBC—the Agency's own HR service provider—did not recommend placing Plaintiff on administrative leave as the sole course of action; when shown the Agency's written representation that Adkins acted "per the recommendation of IBC," Becker testified under oath with a single word: "No." She further testified that administrative leave was "something that Mr. Adkins wanted to move forward with" and that the decision was "ultimately their decision.";

(c) Adkins explicitly stated, in a contemporaneous Board memorandum confirmed under oath by Zahui, that the Agency was initiating a harassment investigation to counter "a likely EEO case from Mr. Dunne"—constituting direct documentary evidence of discriminatory and retaliatory intent;

(d) Adkins characterized Plaintiff's fundamental EEO right to identify the Agency's EEO counselor as a potential violation of the cease-and-desist memorandum and was dissuaded from taking adverse action only by IBC's specific guidance;

(e) The Agency's retaliatory NEEOISO investigation was conducted without interviewing Plaintiff—a fact documented in the investigative record itself—confirming that it was not a legitimate misconduct investigation but a paper exercise designed to manufacture a pretextual record;

(f) Zahui, the architect of the "misconduct" documentation against Plaintiff, subsequently pled guilty to accepting gratuities from a government contractor—the very category of procurement misconduct Plaintiff had sought to investigate—establishing that Zahui's complaints about Plaintiff were motivated by self-preservation, not legitimate concern;

(g) Glin—whose misconduct Plaintiff had investigated and reported—personally lobbied Adkins to characterize Plaintiff's investigation as "badgering and harassment," directly influencing Adkins's retaliatory actions; the Agency's own internal documentation confirms that Glin's complaint to Adkins about Plaintiff was incorporated into the pretextual record used to justify Plaintiff's removal;

(h) Black employees who engaged in substantially identical conduct alongside Plaintiff—Mbayu and Turner—were not subjected to any of the adverse actions taken against Plaintiff; the Agency has never explained this disparity;

(i) Adkins stated to his assistant Battle, on at least three occasions, that he wanted his direct reports to consist exclusively of Black people—and ultimately achieved that objective by removing Plaintiff and filling his position with a Black female;

(j) The Agency's third-party investigator was instructed not to interview Plaintiff, confirming that the investigation was designed to produce a predetermined result;

(k) Adkins ignored eight separate due process requests from Plaintiff over five months, in violation of the Agency's own written misconduct policy MS-327;

(l) Feleke made false and defamatory statements to federal law enforcement characterizing Plaintiff as "dangerous" and "unstable" after Plaintiff initiated the EEO complaint process;

(m) Adkins schemed to transmit derogatory information about Plaintiff to his prospective employer, FERC, after learning Plaintiff was departing the Agency;

(n) IBC's own HR Specialist Becker noted in writing that there was a "close proximity in time" between Plaintiff's USAID OIG filing and his placement on administrative leave—a written acknowledgment by the Agency's own HR service provider, made in the ordinary course of business, that the sequence of events bore the hallmarks of retaliation;

(o) The Agency maintained Plaintiff on administrative leave for 162 days—an extraordinary duration that IBC's specialist testified she had never seen before—without any legitimate investigatory justification; even when the Agency was left without any Federal employee attorneys as a result, Adkins refused to return Plaintiff to duty;

(p) The Agency's own witnesses in USADF-22-HCI-001, including Associate General Counsel Mbayu, conceded that Plaintiff "did see legitimate issues within the agency," confirming that the Agency's misconduct narrative was a pretext to suppress legitimate oversight and protected EEO activity;

(r) Feleke directed Plaintiff to stand down from leading the creation of new standard operating procedures for USADF—a project she had initially assigned to him—and

further directed that CIO Solomon Chi and Yasmine Lonon lead the GISEL software replacement effort from which Plaintiff was removed; these directional changes, occurring in December 2021, stripped Plaintiff of substantive responsibilities and constitute additional acts of retaliation;

(s) James's January 7, 2022 demand memorandum—in which she falsely accused Plaintiff of denying staff requests for interview summaries when no such denials had occurred, and demanded that Plaintiff produce a written justification by January 14—constitutes a documented, false accusation by the Chief of Staff designed to manufacture a pretextual record of OGC misconduct in the two weeks before Adkins's swearing-in;

(t) Zahui's November 29, 2021 retaliatory email alerting contractor DeFreest's Agency supervisor that she had disclosed unlawful procurement practices to Plaintiff during her investigation interview—which directly caused DeFreest to withdraw from the investigation out of fear for her employment—constitutes witness intimidation and obstruction of the internal EEO investigation; and

(u) Feleke's December 2, 2021 recorded instruction to halt the investigation and take no action on any findings—issued the day after Plaintiff delivered the investigation report identifying multiple instances of misconduct—was recorded on a transcript that is now part of the record; that transcript further reveals that Feleke transmitted the Board Chairman's explicit position that he "does not see the need to work with the Office of Government Ethics" regarding Glin's missing financial disclosures, and that Feleke demanded editorial revisions to the investigation report on grounds of protecting the Agency rather than ensuring legal accuracy.

**COUNT I**
**Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964,**
**42 U.S.C. §§ 2000e-2, 2000e-16**

92. Plaintiff adopts and incorporates by reference as is specifically set forth herein the averments of paragraphs 3 through 91 of the Complaint.

93. Defendant, acting through its agents, employees, and officials, discriminated against Plaintiff on the basis of his race (Caucasian) and color (white) with respect to the terms, conditions, and privileges of his employment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and the federal employee provisions of Title VII, 42 U.S.C. § 2000e-16. The evidence described herein is sufficient not only to establish a prima facie case, but to demonstrate by a preponderance of the evidence that the Agency's proffered justifications are pretextual.

94. The discriminatory acts include but are not limited to: (a) falsely restricting Plaintiff's procurement oversight authority in a manner that facilitated the concealment of ongoing criminal misconduct by the CFO; (b) chastising Plaintiff for contacting the former CEO regarding legally required financial disclosures; (c) actively obstructing Plaintiff's exclusive statutory authority as Designated Agency Ethics Official; (d) excluding Plaintiff from the Senior Leadership Team on Adkins's first day in office; (e) placing Plaintiff on involuntary

administrative leave within three days of Adkins's swearing-in, without cause, without prior notice, and without due process; (f) issuing a cease-and-desist memorandum designed to isolate Plaintiff and deter him from exercising EEO rights; (g) directing Plaintiff to return computer equipment and transmitting an Exit Clearance Form, treatment not accorded to any Black colleague who participated in the same investigation; (h) extending Plaintiff's involuntary administrative leave on multiple occasions without cause or due process, to a total of 162 days; (i) ignoring Plaintiff's eight separate written requests for information and due process; (j) initiating a retaliatory third-party investigation without interviewing the accused employee; (k) stripping Plaintiff of substantive leadership responsibilities; (l) canceling Plaintiff's weekly one-on-one meetings with Feleke; and (m) constructively discharging Plaintiff.

95. Adkins's stated objective of having his direct reports consist exclusively of Black people, his direction to hire a Black HR specialist, and the Agency's selection of a Black female to fill the General Counsel position after Plaintiff's departure constitute direct evidence of discriminatory intent that, combined with the absence of any comparable adverse treatment of similarly situated Black employees, establishes liability without reliance on circumstantial inference.

96. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered and continues to suffer damages including loss of professional opportunity, professional harm, emotional distress, and other damages.

**COUNT II**
**Retaliation for Protected EEO Activity in Violation of Title VII,**
**42 U.S.C. §§ 2000e-3, 2000e-16**

97. Plaintiff adopts and incorporates by reference as is specifically set forth herein the averments of paragraphs 3 through 91 of the Complaint.

98. Plaintiff engaged in protected EEO activity, including: (a) conducting an internal investigation of potential EEO violations, including a toxic work environment, at the Agency; (b) reporting potential EEO violations to Agency management, including in a November 13, 2021 email to Feleke and James explicitly identifying multiple categories of workplace allegations and recommending investigation; (c) providing Agency management with repeated written disclosures of potential legal violations including the formal OGE-backed notification on January 5, 2022 that Feleke's and Zahui's conduct constituted interference with his DAEO authority; (d) disclosing the results of the investigation to USAID OIG on December 4, 2021 and continuing to cooperate with USAID OIG through July 2, 2022; (e) formally notifying Adkins, Feleke, James, Zahui, and Board Chairman Leslie in writing on January 29, 2022 that they had retaliated against him as a whistleblower for engaging in protected activities; (f) formally notifying Adkins in writing on February 1, 2022 of the ongoing USAID OIG criminal investigation and requesting return to duty; (g) opposing perceived EEO violations; (h) requesting identification of the Agency's EEO counselor on February 2, 2022; (i) initiating an informal EEO complaint on February 7, 2022; and (j) filing a formal EEO complaint on April 1, 2022. The Agency admitted in response to a Request for Admission that Plaintiff engaged in protected EEO activity.

99. Defendant, acting through its agents, employees, and officials, subjected Plaintiff to adverse treatment causally linked to his protected EEO activity, including all of the acts described in Count I, as well as: (a) issuing a cease-and-desist memorandum in response to Plaintiff's submission of the preliminary investigation report; (b) characterizing Plaintiff's request to

identify the Agency's EEO counselor as a potential violation of the cease-and-desist memorandum; (c) engaging a third-party investigator to investigate Plaintiff in anticipation of his EEO complaint, as admitted in Adkins's own Board memorandum confirmed under oath by Zahui; (d) instructing the third-party investigator not to interview Plaintiff, at the personal direction of Zahui; (e) Feleke's false and defamatory statements to the U.S. Department of Homeland Security Federal Protective Service characterizing Plaintiff as "dangerous" and "unstable"; (f) Adkins's scheme to transmit derogatory information about Plaintiff to FERC; (g) the Agency's suppression of Plaintiff's protected disclosures to USAID OIG; (h) Zahui's November 29, 2021 retaliatory email alerting DeFreest's supervisor that she had cooperated with the investigation; (i) Feleke's halting of the investigation on December 2, 2021 and her written December 11, 2021 elimination of OGC procurement oversight; (j) James's January 7, 2022 demand memorandum falsely accusing Plaintiff of denying staff access to interview summaries; and (k) cancellation of Plaintiff's introductory one-on-one meeting with Adkins, orchestrated by Feleke and James through Elizabeth DeFreest.

100.    The causal connection between Plaintiff's protected activities and the adverse actions is established by multiple independent lines of evidence, including: (i) direct documentary evidence contained in Adkins's Board memorandum explicitly stating retaliatory intent; (ii) temporal proximity between each protected activity and the corresponding adverse action; (iii) the pretextual nature of the Agency's stated reasons for its actions, compounded by Zahui's criminal guilty plea for the exact misconduct Plaintiff had sought to investigate; (iv) the Agency's own admissions in discovery that Plaintiff engaged in protected EEO activity; and (v) the continuous, escalating pattern of adverse conduct by Feleke, James, and Zahui

from November 29, 2021 through February 2, 2022 that predates Adkins's arrival and demonstrates the retaliatory campaign was a coordinated Agency-wide effort.

101.   As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff suffered and continues to suffer damages including loss of professional opportunity, professional harm, emotional distress, and other damages.

### COUNT III
### *Per Se* Retaliation in Violation of Title VII,
### 42 U.S.C. §§ 2000e-3, 2000e-16

102.   Plaintiff adopts and incorporates by reference as is specifically set forth herein the averments of paragraphs 3 through 91 of the Complaint.

103.   Defendant's conduct constitutes *per se* retaliation in violation of Title VII's anti-reprisal provisions, 42 U.S.C. § 2000e-3(a). *Per se* retaliation occurs when a supervisor's actions are reasonably likely to deter the employee or a reasonable employee from engaging in, or pursuing, protected EEO activity. A finding of specific discriminatory intent is not required to establish *per se* retaliation; the inquiry is objective.

104.   The following specific acts of Defendant constitute *per se* retaliation: (a) On January 28, 2022, Adkins issued a cease-and-desist memorandum threatening disciplinary action on the same day Plaintiff submitted his EEO-related investigation report and requested due process. (b) Adkins characterized Plaintiff's request for the Agency to identify its EEO counselor as a potential violation of the cease-and-desist memorandum; the documented intent to penalize EEO activity was present, and only IBC's intervention prevented its implementation. (c) In a memorandum to the Board of Directors, Adkins explicitly stated that the Agency would initiate a harassment investigation to counter "a likely EEO case from Mr. Dunne." Zahui

confirmed under oath that this memorandum's statements were not untrue. (d) The Agency directed the NEEOISO investigator to exclude Plaintiff from his own misconduct investigation, at the personal direction of Zahui. (e) Feleke's December 2, 2021 recorded instruction to Plaintiff to cease the investigation and take no action on any findings constitutes per se interference with EEO-protected investigative activity. (f) Zahui's November 29, 2021 email alerting DeFreest's supervisor that she had cooperated with Plaintiff's authorized investigation—directly causing her withdrawal—constitutes per se retaliation against a participating witness. (g) James's January 7, 2022 false accusation memorandum constitutes per se retaliatory fabrication of misconduct charges. (h) Feleke's formal written elimination of GC procurement oversight on December 11, 2021 constitutes per se retaliation by stripping the protected actor of the functional authority that enabled the protected activity.

105.    As a direct and proximate result of Defendant's per se retaliatory conduct, Plaintiff suffered and continues to suffer damages including loss of professional opportunity, professional harm, emotional distress, and other damages.

**COUNT IV**
**Constructive Discharge in Violation of Title VII,**
**42 U.S.C. §§ 2000e-2, 2000e-3, 2000e-16**

106.    Plaintiff adopts and incorporates by reference as is specifically set forth herein the averments of paragraphs 3 through 91 of the Complaint.

107.    Defendant's unlawful conduct, taken together, rendered Plaintiff's working conditions so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign. These conditions include: (a) being placed on indefinite involuntary administrative

leave for approximately 162 days without cause, without due process, and without any explanation of the specific allegations; (b) being subjected to a cease-and-desist memorandum prohibiting contact with Agency colleagues; (c) being completely denied access to Agency systems, data, and his workplace; (d) Adkins's refusal to respond to any of Plaintiff's eight separate requests for information or due process over five months; (e) being subjected to a one-sided third-party investigation without notice of the allegations and without being interviewed; (f) Feleke's deposition testimony that Plaintiff's return to his position as General Counsel was "not under consideration"; (g) Adkins's explicit statement during the January 21, 2022 meeting that the administrative leave was "a first step in an adverse action," confirming that Plaintiff's removal was the predetermined goal; (h) Feleke's false and defamatory characterization of Plaintiff as "dangerous" and "unstable" to federal law enforcement; (i) Adkins's scheme, documented in writing, to transmit derogatory information about Plaintiff to FERC; and (j) the Agency's abandonment of any pretense of investigation, leaving the Agency without a single Federal employee attorney for over 332 days rather than reinstating Plaintiff.

108.    A constructive discharge occurs when an employer deliberately renders an employee's working conditions so intolerable that the employee is forced to leave. The fact that Plaintiff secured alternative employment does not demonstrate that his departure was voluntary—it demonstrates that he was able to mitigate his damages by finding new work.

109.    As a direct and proximate result of Defendant's conduct resulting in Plaintiff's constructive discharge, Plaintiff suffered and continues to suffer damages including back pay, front pay, loss of benefits, loss of professional opportunity, professional harm, emotional distress, and other damages.

## COUNT V
### Interference with EEO Rights and Obstruction of the EEO Process in Violation of Title VII

110.    Plaintiff adopts and incorporates by reference as is specifically set forth herein the averments of paragraphs 3 through 91 of the Complaint.

111.    42 U.S.C. §§ 2000e-3\ prohibits any agency from interfering with the EEO complaint process or retaliating against any individual because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.

112.    Defendant, through Adkins, directly interfered with Plaintiff's EEO rights by: (a) threatening Plaintiff with disciplinary action for requesting access to the EEO complaint process; (b) characterizing Plaintiff's request to identify the Agency's EEO counselor as a potential violation of the cease-and-desist memorandum, and being dissuaded from taking adverse action only by IBC's specific intervention; (c) failing to maintain an EEO counselor or EEO service provider, thereby obstructing Plaintiff's ability to access the EEO process; (d) explicitly stating in a Board memorandum that the Agency was initiating a third-party investigation in anticipation of Plaintiff's EEO case, constituting direct and explicit interference with the EEO process confirmed under oath by Zahui; and (e) directing that Plaintiff not be interviewed in the Agency's retaliatory NEEOISO investigation, thereby denying Plaintiff the most basic procedural protection afforded to employees.

113.    As a direct and proximate result of Defendant's interference with Plaintiff's EEO rights, Plaintiff suffered and continues to suffer damages.

## COUNT VI
### Hostile Work Environment Based on Race and Reprisal in Violation of Title VII, 42 U.S.C. §§ 2000e-2(a), 2000e-16

114.    Plaintiff adopts and incorporates by reference as is specifically set forth herein the averments of paragraphs 3 through 91 of the Complaint.

115.    Defendant subjected Plaintiff to a hostile work environment based on his race (Caucasian), color (white), and reprisal for protected EEO activity, in violation of Title VII. The hostile work environment claim is a distinct cause of action from the discrete adverse actions alleged in Counts I through V. Because the hostile work environment constitutes a single unlawful employment practice, the continuing violation doctrine permits the Court to consider all acts constituting the hostile environment, including acts occurring prior to the 45-day EEO counselor contact period, so long as at least one act within the hostile environment occurred within the limitations period. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002). Here, the acts constituting the hostile environment spanned from November 2021 through July 2, 2022, and multiple acts—including the cease-and-desist memorandum, the extension of administrative leave, and the Agency's failure to respond to Plaintiff's due process requests—occurred well within the limitations period.

116.    The hostile work environment included, but was not limited to, the following acts: (a) Zahui's false restriction of Plaintiff's procurement oversight authority on November 19, 2021; (b) Zahui's November 29, 2021 retaliatory email alerting DeFreest's supervisor that she had cooperated with the authorized internal investigation; (c) Feleke's December 2, 2021 instruction to Plaintiff to halt the investigation and suppress all findings; (d) Feleke's December 11, 2021 formal written elimination of GC procurement oversight; (e) the December 2021 campaign of micro-surveillance and obstruction of Plaintiff's General Counsel functions; (f) Feleke's January 4, 2022 cancellation of her weekly one-on-one meetings with Plaintiff; (g) James's January 7, 2022 false accusation memorandum; (h)

Zahui's January 7, 2022 "do over" email; (i) cancellation of Plaintiff's introductory one-on-one meeting with Adkins; (j) Adkins's expressed intent to have his direct reports consist exclusively of Black people; (k) the removal of Plaintiff from the Senior Leadership Team on Adkins's first day; (l) placement on indefinite involuntary administrative leave on January 21, 2022; (m) Adkins's refusal to answer basic questions during the January 21 administrative leave meeting; (n) issuance of the cease-and-desist memorandum on January 28, 2022; (o) Zahui's personal direction of the NEEOISO investigation and his direction to exclude Plaintiff from his own misconduct proceeding; (p) complete denial of access to the workplace and work systems; (q) Zahui's transmission of the Exit Clearance Form and equipment return demand; (r) persistent failure to respond to Plaintiff's eight separate written requests for information and due process over five months; (s) Feleke's false and defamatory statements to the U.S. Department of Homeland Security Federal Protective Service; (t) Adkins's attempt to poison Plaintiff's employment prospects with FERC; and (u) the Agency's abandonment of any pretense of investigation, leaving itself without Federal employee attorneys for over 332 days rather than reinstating Plaintiff.

117. This conduct was severe and pervasive, was based on Plaintiff's race, color, and protected EEO activity, was objectively hostile, and was both subjectively perceived as hostile by Plaintiff and would be perceived as hostile by a reasonable person in Plaintiff's position. The Agency's argument that the individual incidents were insufficiently severe does not address the totality of the conduct: the hostile work environment standard requires consideration of all of the circumstances, and the sum of these acts—directed exclusively at the only Caucasian/white employee involved in the internal investigation—is sufficient to support the claim as a matter of law.

118.    As a direct and proximate result of Defendant's creation and maintenance of a hostile work environment, Plaintiff suffered and continues to suffer damages including professional harm, emotional distress, and other damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mateo Dunne respectfully requests that this Court enter judgment in his favor and against Defendant U.S. African Development Foundation, and award the following relief:

(A) A declaration that Defendant's conduct violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and EEOC regulations, 29 C.F.R. § 1614.101 et seq.;

(B) An injunction directing Defendant to reinstate Plaintiff to his position as General Counsel at USADF, or in the alternative, award front pay in lieu of reinstatement, in an amount to be determined at trial;

(C) Back pay and all lost wages, salary, employment benefits, and other compensation, including any promotions or pay increases Plaintiff would have received but for Defendant's unlawful conduct, from July 2, 2022, with prejudgment interest, in an amount to be determined at trial;

(D) Compensatory damages for past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, in an amount to be determined at trial, up to the applicable statutory limits under 42 U.S.C. § 1981a;

(E) An order requiring Defendant to expunge and remove from Plaintiff's personnel records all adverse documents, memoranda, and notations relating to the unlawful actions described herein, including the administrative leave memoranda, the cease-and-desist memorandum, and all records generated by or related to the retaliatory NEEOISO investigation (USADF-22-HCI-001);

(F) An injunction requiring Defendant to bring its EEO program into full compliance with applicable Federal EEO laws and regulations, including the requirement to maintain EEO counselors, to provide annual EEO training to all personnel, and to send annual EEO notification emails to all personnel;

(G) Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k);

(H) Prejudgment and post-judgment interest at the maximum rate allowed by law; and

(I) Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

_/s/_ Philip Musolino
Philip M. Musolino
D.C. Bar No.: 294652
Musolino & Dessel, PLLC
1615 L Street, NW, Suite 440
Washington, DC 20036
Phone: (202) 466-3883
Email: pmusolino@musolinodessel.com